**Counsel of Record:**

Stephan J. Schlegelmilch
Bridget M. Fitzpatrick
Daniel M. Hawke
Antonia Chion
Robert A. Cohen
Jason J. Burt
Carolyn M. Welshhans
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-4935 (Schlegelmilch)
Facsimile: (202) 772-9292 (Schlegelmilch)


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————  :
                                              :
**UNITED STATES SECURITIES AND**   :
**EXCHANGE COMMISSION**             :
                                              :
           **Plaintiff,**           :
                                              :
           **vs.**                  :        **Civil No.**
                                              :
**FRANK TAMAYO**                    :
                                              :        **Jury Trial Demanded**
           **Defendant.**           :
———————————————————————  :

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), 100 F

Street, N.E., Washington, DC 20549, for its Complaint against Defendant Frank Tamayo

("Tamayo"), whose address is 259 21st St., Apt. 1A, Brooklyn, NY 11215, alleges as follows:

### SUMMARY

1.      This is an insider trading case.  The scheme involved three participants: (a) Steven

Metro ("Metro"), the source, who over the course of several years repeatedly stole material,

nonpublic information about pending mergers and acquisitions and tender offers from his

employer, Simpson Thacher & Bartlett LLP ("Simpson Thacher"), an international law firm; (b)

Tamayo, the middleman, who passed along the information he received from Metro to his

broker, Vladimir Eydelman ("Eydelman"), and traded in at least 12 instances; and (c) Eydelman,

the broker, who received the tips from Tamayo and traded on the basis of the material, nonpublic

information in at least 13 instances.

2.      From at least February 2009 through March 2014 (the "Relevant Period"), Metro

was an employee of Simpson Thacher.  Metro repeatedly accessed material, nonpublic

information on Simpson Thacher's computer systems regarding firm clients that were about to

participate in a corporate transaction.  He then arranged meetings with Tamayo at bars and coffee

shops in New York City and passed on the material, nonpublic information with the

understanding that Tamayo would use the information to trade.  Tamayo knew that Metro

worked for a law firm, that the information passed to him was material and nonpublic, and that

Metro had obtained it through the course of his employment at the law firm.

3.      Tamayo then passed the information to his friend and stockbroker, Eydelman.

Except at the very beginning of the scheme, the passing of material, nonpublic information

occurred at the same location – Grand Central Station.  Tamayo passed the information to

Eydelman by showing him a post-it note or napkin on which Tamayo wrote the stock ticker

symbol of the company to be acquired.  Tamayo then chewed up, and sometimes ate, the post-it

note or napkin to destroy evidence of the tip.  Tamayo also conveyed to Eydelman at this time

the approximate transaction price and timing of the deal.

4.      Following this clandestine exchange, Eydelman returned to his office, typically

gathered research relating to the target company, and emailed Tamayo the research and/or

Eydelman's supposed thoughts as to why buying the stock made sense, with the intent to create a paper trail of false and contrived emails that purportedly served as non-fraudulent bases for the illegal trading by Tamayo and Eydelman.

5.  Metro and Tamayo had an agreement that called for Tamayo to allot a portion of the illicit profits to Metro and to keep this allotment in Tamayo's brokerage account.  Metro and Tamayo discussed how much of the allotment Metro wanted to use to trade when he identified new deals involving Simpson Thacher clients.  As the scheme continued, Metro's portion of the illicit profits in Tamayo's brokerage account grew.

6.  Metro, Tamayo, and Eydelman deliberately structured their scheme this way to avoid detection, allowing Metro to share in the proceeds of the fraud without fear of discovery for trading on information he obtained in the course of his employment and enabling Eydelman and Tamayo to profit without being connected to a source with access to inside information.

7.  Tamayo and Eydelman used the material, nonpublic information obtained from Metro to trade the target companies' securities, personally and on behalf of their family members; Eydelman further traded on behalf of more than 50 of his brokerage customers, for which he received substantial commissions.  The trading by Tamayo, Eydelman, and Eydelman's customers included both stock and options transactions.  Tamayo and Eydelman sometimes also communicated with their friends, who then also traded in advance of the announcements.

8.  Over the course of three and half years, this insider trading scheme involved transactions in at least 13 issuers' securities and yielded over $5.6 million in illegal profits to Metro, Tamayo, Eydelman, their families and friends, and Eydelman's customers.  Tamayo's agreement with Metro resulted in over $168,000 being apportioned to Metro as his share of

profits from the insider trading scheme, in addition to the profits reaped by Metro from his personal trading in advance of at least two of the transactions.

9.     Tamayo, trading through his own accounts and accounts in the names of his girlfriend and sister, traded in advance of 12 of the 13 deal announcements, yielding profits of approximately $1,056,970.

10.     By knowingly or recklessly engaging in the conduct described in this Complaint, Tamayo violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. § 77q(a)*], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder, and Section 14(e) of the Exchange Act [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

11.     The Commission seeks permanent injunctions against Tamayo, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all profits realized or losses avoided from the unlawful insider trading activity set forth herein, and civil penalties pursuant to Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(d)(3)*].  The Commission also brings this action pursuant to Section 21A of the Exchange Act [*15 U.S.C. § 78u-1*] for civil penalties against Tamayo under the Insider Trading and Securities Fraud Enforcement Act of 1988, and for such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [*15 U.S.C. § 77t(b)*] and Sections 21(d) and 21A of the Exchange Act [*15 U.S.C. §§ 78u(d) and*

4

78u-1], to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

13.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [*15 U.S.C. §§ 77t(b) and 77v(a)*] and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*].

14.     Venue in this district is proper under Section 22(a) of the Securities Act [*15 U.S.C. § 77v(a)*] and Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of New Jersey and elsewhere, and were effected, directly or indirectly, by making use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## THE DEFENDANT

15.     **Defendant Frank Tamayo**, age 40, is a resident of Brooklyn, New York. Tamayo worked as a mortgage broker during the Relevant Period and is a longtime friend of both Metro and Eydelman.  Tamayo owned several brokerage accounts for which Eydelman served as the registered representative, first at Oppenheimer & Co. and later at Morgan Stanley. Tamayo made timely purchases in the securities of 12 of the 13 issuers that are the subject of this action.

## RELEVANT ISSUERS AND ANNOUNCEMENTS

16.     **Brink's Home Security Holdings, Inc. ("Brink's")** is a Virginia corporation headquartered in Irving, Texas.  At all relevant times, Brink's common stock was registered with

the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange ("NYSE").  The company installs, services, and monitors security system alarms for residential and commercial properties.  On January 18, 2010, Tyco International Ltd. ("Tyco") entered into a definitive agreement to acquire Brink's.  Simpson Thacher advised Tyco in connection with the transaction.

17.    **CNA Surety Corp. ("CNA Surety")** is a Delaware corporation headquartered in Chicago, Illinois.  At all relevant times, CNA Surety's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company is a provider of surety and surety-related products, ranging from small commercial bonds to large contract bonds.  On November 1, 2010, CNA Financial Corporation ("CNA Financial") announced its intention to acquire all of the outstanding shares of common stock of CNA Surety.  Simpson Thacher advised CNA Financial in connection with the tender offer.

18.    **Collective Brands, Inc. ("Collective Brands")** is a Delaware corporation headquartered in Topeka, Kansas.  At all relevant times, Collective Brands' common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company sells lifestyle, fashion, and performance brands to consumers worldwide.  On May 1, 2012, Collective Brands announced that it entered into a definitive agreement under which Collective Brands would be acquired by a consortium comprised of Wolverine Worldwide, Blum Capital Partners, and Golden Gate Capital.  Simpson Thacher advised JPMorgan Securities LLC and JPMorgan Chase Bank, N.A. in connection with financing a portion of Wolverine Worldwide's acquisition of Collective Brands.

19.    **Graham Packaging Company Inc. ("Graham")** is a Delaware corporation headquartered in York, Pennsylvania.  At all relevant times, Graham's common stock was

registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company manufactures and sells custom plastic packaging products to food and beverage, household, personal care and automotive lubricants products companies.  On April 13, 2011, Silgan Holdings Inc. entered into a definitive agreement to acquire Graham.  Simpson Thacher advised Graham in connection with the transaction.

20.     **International Coal Group, Inc. ("International Coal")** is a Delaware corporation headquartered in Scott Depot, West Virginia.  At all relevant times, International Coal's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company owns, mines, and produces steam and coal.  On May 1, 2011, Arch Coal, Inc. announced a tender offer to acquire International Coal. Simpson Thacher advised Arch Coal, Inc. in connection with the transaction.

21.     **OfficeMax Inc. ("OfficeMax")** is a Delaware corporation headquartered in Naperville, Illinois.  At all relevant times, OfficeMax's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company sells office supplies to various consumers.  On February 20, 2013, Office Depot, Inc. announced that it would acquire OfficeMax.  Simpson Thacher advised Office Depot, Inc. in connection with the transaction.

22.     **PharMerica Corporation ("PharMerica")** is a Delaware corporation headquartered in Louisville, Kentucky.  At all relevant time, PharMerica's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company provides pharmacy products and services in various care settings.  On August 23, 2011, Omnicare, Inc. ("Omnicare") announced a tender offer for PharMerica.

Simpson Thacher advised PharMerica, Omnicare, or another party involved in the possible corporate transaction concerning PharMerica.

23.     **Sealy Corporation ("Sealy")** is a Delaware corporation headquartered in Trinity, North Carolina.  At all relevant times, Sealy's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.  The company manufactures and markets bedding products, including mattresses and mattress foundations.  On September 26, 2012, Tempur-Pedic International Inc. entered into a definitive agreement to acquire Sealy.  Simpson Thacher advised Sealy in connection with the transaction.

24.     **Sirius XM Radio Inc. ("Sirius")** is a Delaware corporation headquartered in New York, New York.  At all relevant time, Sirius's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ.  The company broadcasts news, sports, and other channels over satellite radio systems.  On February 17, 2009, Liberty Media Corporation announced its intent to lend Sirius $530 million. Simpson Thacher advised Sirius in connection with the transaction.

25.     **SMART Modular Technologies (WWH), Inc. ("SMART Modular")** is a Cayman Islands corporation headquartered in Newark, California.  At all relevant times, SMART Modular's ordinary shares were registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ.  The company is a designer, manufacturer and supplier of memory modules and solid state storage products.  On April 26, 2011, Silver Lake Partners and Silver Lake Sumeru entered into a definitive agreement to acquire SMART Modular.  Simpson Thacher advised both Silver Lake entities in connection with the transaction.

26.     **Smithtown Bancorp Inc. ("Smithtown")** is a New York corporation headquartered in Hauppauge, New York.  At all relevant times, Smithtown's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ.  The company provides a range of banking services to consumers, businesses and municipalities located primarily within the greater New York City area.  On July 15, 2010, Smithtown announced its entry into a definitive agreement to merge with People's United Financial, Inc. ("People's").  Simpson Thacher advised People's in connection with the transaction.

27.     **Vital Images, Inc. ("Vital")** is a Minnesota corporation headquartered in Minnetonka, Minnesota.  At all relevant times, Vital's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ.  The company provides visualization and image analysis to medical professionals.  On April 27, 2011, Vital announced that it had accepted Toshiba Medical Systems Corp.'s ("Toshiba") tender offer.  Simpson Thacher advised Toshiba in connection with the transaction.

28.     **Company A** is a Delaware corporation.  At all relevant times, Company A's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ.  In 2012, Simpson Thacher advised Company A or another party involved in a possible corporate transaction between Company A and another company.  This possible corporate transaction did not occur and has not been made public.

## OTHER RELEVANT PEOPLE AND ENTITIES

29.     **Vladimir Eydelman ("Eydelman")**, age 42, is a resident of Colts Neck, New Jersey.  Eydelman was a registered representative employed by Oppenheimer & Co., Inc. ("Oppenheimer") from March 19, 2001, until September 9, 2012.  He was employed as a

registered representative with Morgan Stanley through March 2014 and has series 7, 24, 63, and

65 designations.  Eydelman is a friend of Tamayo and is his stock broker.  On March 19, 2014,

the Commission charged Eydelman with violations of Section 17(a) of the Securities Act [*15*

*U.S.C. § 77q(a)*] and Sections 10(b) and 14(e) of the Exchange Act [*15 U.S.C. § 78j(b)* and *15*

*U.S.C. § 78n(e)*] and Rules 10b-5 and 14e-3 thereunder [*17 C.F.R. § 240.10b-5* and *17 C.F.R. §*

*240.14e-3*], based on his conduct in the scheme described herein.  On the same day, Eydelman

was also criminally charged by the United States Attorney's Office for the District of New Jersey

for substantially the same conduct.

30.     **Steven Metro ("Metro")**, age 40, is a resident of Katonah, New York.  Metro

was employed by Simpson Thacher as a managing clerk during the Relevant Period.  He

graduated from law school but is not a practicing attorney.  Metro and Tamayo have been friends

since approximately 1995.  On March 19, 2014, the Commission charged Metro with violations

of Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*] and Sections 10(b) and 14(e) of the

Exchange Act [*15 U.S.C. § 78j(b)* and *15 U.S.C. § 78n(e)*] and Rules 10b-5 and 14e-3 thereunder

[*17 C.F.R. § 240.10b-5* and *17 C.F.R. § 240.14e-3*], based on his conduct in the scheme

described herein.  On the same day, Metro was also criminally charged by the United States

Attorney's Office for the District of New Jersey for substantially the same conduct.

31.     **Simpson Thacher & Bartlett LLP ("Simpson Thacher")** is an international,

full-service law firm headquartered in New York, New York.  It employs approximately 800

lawyers in ten offices worldwide.  According to its website, Simpson Thacher is especially well

known for "provid[ing] coordinated legal advice on the largest and most complex corporate

transactions."  At all times during the Relevant Period, Metro was employed by Simpson

Thacher as a managing clerk.

## STATEMENT OF FACTS

### Metro, Tamayo, and Eydelman's Relationship

32.     Metro and Tamayo have been friends since approximately 1995, when they both attended Touro College of Law together.  During and prior to the Relevant Period, the two met for drinks, attended social functions together, and regularly traveled together to various Atlantic City casinos.

33.     Prior to and during the Relevant Period, Metro and Tamayo communicated by telephone, email, text message, and in-person, and their communications surged shortly before each of the 13 transaction announcements referenced above.  Tamayo knew that Metro worked at Simpson Thacher.  Indeed, Metro and Tamayo exchanged nearly 100 emails using Metro's Simpson Thacher email account.

34.     Tamayo and Eydelman have known each other since at least 2003, when the two met at a party thrown by a mutual friend.  Tamayo subsequently opened a brokerage account at Oppenheimer for which Eydelman served as the registered representative.  In September 2012, Eydelman changed employers from Oppenheimer to Morgan Stanley.  Soon thereafter, Tamayo transferred his accounts to Morgan Stanley and to Eydelman.

35.     Tamayo and Eydelman are friends.  Prior to and during the Relevant Period, the two spoke frequently and attended sporting events and social functions together.

36.     It is unclear whether Metro has ever met Eydelman.  Metro and Eydelman's sole connection is their mutual friend, Tamayo.

### Metro Accessed Material, Nonpublic Information While Employed by Simpson Thacher

37.     Metro worked at Simpson Thacher during the Relevant Period.

11

38.     Simpson Thacher served as an adviser to a party involved in each of the 13 transaction announcements referenced above (including, in at least one instance, a party providing financing for the transaction).  As an adviser, Simpson Thacher obtained material, nonpublic information regarding the transactions, including the parties, the timing, and the transaction price.

39.     Simpson Thacher owed and owes fiduciary duties of loyalty and confidentiality to, among others, its clients, which includes an obligation to maintain the confidentiality of information obtained by, or provided to, Simpson Thacher and its employees in connection with advising clients.

40.     Metro had access to highly confidential information related to corporate deals, including each transaction listed above.

41.     Metro, as an employee of Simpson Thacher with access to confidential information, owed a duty or obligation arising from his relationship of trust and confidence to his employer and its clients to keep confidential such nonpublic information.  Metro also had a duty to disclose (or if disclosure was impossible or improper) to abstain from trading upon the material, nonpublic information he possessed.

42.     Metro knew that he was not permitted to trade on the basis of the nonpublic, client-related information he accessed in the course of his employment, and he also knew that he could not provide others with this information, especially when he knew or was reckless in not knowing that the person to whom he provided the information would trade, or cause others to trade, on the basis of the nonpublic information.

43.     News of the transactions, when disclosed, had a material impact on the stock prices and/or trading volumes of the public companies associated with 12 of the announcements

above. The only exception was the potential transaction involving Company A, because that potential transaction did not occur and has not been made public.

44.     Metro obtained the confidential, nonpublic information by accessing material on the firm's internal computer system to determine whether a corporate deal was imminent.  Metro told Tamayo that he did so in a way that Metro believed would leave no evidence that he had accessed the documents, which would possibly expose the scheme.

45.     Since at least February 2009, Metro misappropriated and disclosed material, nonpublic client information to his friend Tamayo in at least 13 instances, and in each instance, Tamayo passed that material, nonpublic information along to his friend Eydelman.

## The Beginning of the Scheme: Sirius XM Radio

46.     The scheme began in early February 2009 at a bar in New York City when Tamayo met Metro and other friends for drinks.  Metro and Tamayo separated from the rest of their friends and began discussing stocks, including Tamayo's current holdings in Sirius XM Radio ("Sirius").  Tamayo expressed worry that shares of Sirius were trading at an extremely low price and that Sirius might go bankrupt.  Metro then told Tamayo that Liberty Media Corp. ("Liberty") planned to invest over $500 million in Sirius.  Metro told Tamayo that he obtained this information by viewing documents at the law firm where he worked; Tamayo understood this to mean that the information was confidential, client information.

47.     Following the discussion with Metro, Tamayo called Eydelman and told him to buy additional shares of Sirius for Tamayo's account.  Eydelman expressed the same concerns to Tamayo that Tamayo had expressed to Metro – namely, concerns about Sirius's viability, including a belief that Sirius might go bankrupt.  Tamayo reassured Eydelman, however, that he

13

had information from a reliable "source" that Liberty planned to make a $500 million investment in Sirius.  Tamayo told Eydelman that his "source" was a friend who worked at a law firm.

48.     On February 12, 2009, Tamayo called Eydelman at 8:24 a.m., and the two spoke for more than two and a half minutes.  Tamayo called Metro at 12:33 p.m. and again at 3:17 p.m. Eydelman began purchasing shares of Sirius in Tamayo's account at 3:55 p.m. that day, and he later called Tamayo at 4:16 p.m.  That night, Tamayo called Metro at 10:00 p.m., and the two spoke for nearly eight minutes.

49.     On February 12 and 13, 2009, Tamayo purchased 300,000 shares of Sirius for $27,900.

50.     Also on February 13, 2009, a friend of Tamayo's, who also was a client of Eydelman's, purchased 50,000 shares of Sirius for $5,015.

51.     On February 17, 2009, Liberty announced its intent to lend Sirius $530 million.

52.     Following the announcement, Sirius's stock price closed at $0.16 per share, a $0.06 increase, or 60 percent, over the prior trading day's close with an increased trading volume of more than 40 percent.

53.     Tamayo's potential profits from his purchases based on Metro's tip were $20,100 based on the closing share price on the day of the announcement.  Tamayo ultimately sold the 300,000 shares a few months later, after Sirius's stock price had increased further, for a profit of approximately $157,892.  Tamayo's friend (who is also an Eydelman customer) sold 45,000 of his Sirius shares for total profits of approximately $54,922.

54.     Tamayo told Metro following the announcement that he had set aside approximately $7,000 for Metro as a "thank you" for the information.  Instead of taking the

14

money, Metro told Tamayo that Tamayo should leave it in his brokerage account and invest it on

Metro's behalf based on confidential information that Metro planned to pass to him in the future.

### The Scheme Matures: Post-Sirius Information Passing

55.     Following the passing of credible, accurate and highly lucrative information

related to Sirius, Metro, Tamayo, and Eydelman settled into a routine in which they sought to

cloak their gathering and passing of material, nonpublic information.

56.     First, Metro accessed his employer's and his employer's clients' material,

nonpublic information using Simpson Thacher's computer network to identify the possible

subject of a corporate transaction and important details, such as the transaction's expected timing

and premium above the target company's current share price.  Metro then asked Tamayo to meet

in person.

57.     Metro and Tamayo typically met at a coffee shop in New York City.  Metro

passed the confidential, nonpublic information to Tamayo by showing Tamayo his cell phone

screen onto which he had typed the names and/or ticker symbols of the two companies involved

in the transaction for which he had confidential information.  Metro pointed to the names and/or

ticker symbols on his phone to indicate to Tamayo which company was the acquirer and which

company was being acquired.  Metro also conveyed the approximate price of the transaction and

the approximate announcement date.  Tamayo then communicated to Eydelman that they should

meet.

58.     Eydelman and Tamayo met near the clock at the information booth in Grand

Central Station.  In advance of this meeting, Tamayo wrote on a post-it note or napkin the name

and/or ticker symbol of the company whose stock price was likely to increase as a result of the

corporate transaction.  Once at Grand Central Station, Tamayo walked up to Eydelman, showed

him the post-it note or napkin, and then chewed up, and sometimes ate, the piece of paper. The purpose of doing so was to destroy the evidence of the tip.  Tamayo also conveyed to Eydelman the approximate price of the transaction and the approximate announcement date.

59.     Eydelman then returned to his office, typically gathered research relating to the target company, and then typically emailed Tamayo the research and/or Eydelman's purported thoughts as to why buying the stock made sense.  The purpose of these contrived emails was to create what Eydelman and Tamayo believed to be a sufficient paper trail that included a plausible justification for engaging in the transaction.  In reality, Eydelman and Tamayo had decided to invest in the target company based not on the "research" Eydelman gathered but on the material, nonpublic information provided by Metro.

60.     In at least 13 instances, Tamayo tipped Eydelman the misappropriated material, nonpublic information that Metro gave him, knowing that Eydelman would then trade on the basis of that information.

### Tamayo Traded Based on the Information Passed to Him, Which He Knew or Should Have Known was Tipped in Breach of a Duty

61.     As described above, during the Relevant Period Metro tipped Tamayo with material, nonpublic information that Metro misappropriated from Simpson Thacher concerning at least 13 transaction announcements.  In each instance, Tamayo then tipped Eydelman.

62.     Tamayo, trading through his own accounts and accounts in the name of his girlfriend and sister, traded in advance of 12 of the 13 deals.

63.      Metro's tipping of information to Tamayo created a derivative duty in Tamayo to keep confidential the same material, nonpublic information about Simpson Thacher's clients.

64.     Tamayo breached the duty he inherited from Metro when he tipped the material, nonpublic information to Eydelman with the intent that he trade, and with the expectation of

16

receiving a benefit, and when he made his own trades on the basis of the material, nonpublic information, at a time when he knew or should have known that the information obtained from Metro was tipped in breach of a duty.

65.     Based on all the facts and circumstances, Tamayo knew or should have known that Metro had a duty to keep this information confidential, that Metro's disclosure of this information violated his duty of confidentiality, and that he should not trade on the basis of this information, or provide it to others for trading.  Tamayo also knew or should have known that Metro was breaching his duty to Simpson Thacher because of, among other reasons, the timeliness, accuracy, and repeated nature of the information Metro provided to him, the clandestine nature of the transfers of the material, nonpublic information, and the secret manner in which Metro was compensated for the tips he provided.

66.     Similarly, because Tamayo knew the material, nonpublic information about the impending tender offers herein identified in paragraphs 17, 20, 22, and 27 came from Metro, whose firm worked as legal adviser in the deal, Tamayo also knew or had reason to know that the information he received, either directly or indirectly, about the pending tender offers was material and nonpublic and that he was prohibited from tipping Eydelman or otherwise causing the purchase or sale of the security to be sought by the tender offer.

### The Post-Sirius Deals

#### 1.  *Brink's Home Security Holdings, Inc.*

67.     On or about December 22, 2008, Simpson Thacher first billed work to its client, Tyco, in connection with Tyco's possible acquisition of Brink's.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

17

68.     The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Tyco's possible acquisition of Brink's.  In addition to how the scheme functioned generally, Metro also billed time to Simpson Thacher's client, Tyco, with respect to Tyco's possible acquisition of Brink's. Additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

69.     The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

70.     Metro worked for Simpson Thacher and, by virtue of his employment and work in connection with the acquisition, obtained material, nonpublic information regarding Tyco's possible acquisition of Brink's.

71.     Metro misappropriated from his employer and its client material, nonpublic information concerning Tyco's possible acquisition of Brink's, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of Brink's by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

72.     Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Tamayo knew Metro was employed at Simpson Thacher, and he also knew that Metro had access

to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

73.    Metro first billed time in connection with the acquisition on December 29, 2009.

74.    Later that night, at 11:04 p.m., Metro sent a text message to Tamayo.

75.    Over the course of the following day, December 30, 2009, Tamayo called Metro twice, spoke with Eydelman twice, and then exchanged six more telephone calls with Metro. Beginning the next morning, December 31, 2009, at 9:36 a.m., Eydelman began to purchase shares of Brink's for some of his customers.

76.    Tamayo and Eydelman (including on behalf of his customers) invested more than $700,000 in shares of Brink's that day.

77.    Later on the morning of December 31, 2009, Tamayo and Eydelman communicated twice, and then Tamayo and Metro exchanged seven text messages and spoke once by telephone.  Thereafter, Tamayo and Eydelman spoke two more times by telephone.

78.     As discussed below in paragraphs 262 through 264, Eydelman and Tamayo began exchanging contrived emails about Brink's on December 31, 2009, at 1:29 p.m., after they had decided to purchase and had already begun purchasing shares based on the material, nonpublic information provided by Metro.

79.    Between December 31, 2009, and January 15, 2009, Metro, Tamayo, and Eydelman's communications surged.  Tamayo and Metro communicated by telephone or text 25 times, and Tamayo and Eydelman communicated by telephone or text 25 times.

80.    During this 16-day period, Tamayo, Eydelman, and the accounts of Eydelman's family and customers continued to purchase additional Brink's shares and options.

81.     In addition, Tamayo communicated with friends who also purchased Brink's securities between December 30, 2009, and January 15, 2010.  For example, Tamayo began communicating with one friend on December 30, 2009, less than 15 minutes after exchanging texts with Metro.  This friend purchased 200 shares of Brink's a few days later.  Tamayo also called another friend on December 31, and this friend bought 300 shares of Brink's less than 15 minutes later.

82.     Between December 30, 2009, and January 15, 2010, Eydelman invested approximately $1,391,254 in shares of Brink's on behalf of his family and his customers, including Tamayo.  Eydelman invested another approximately $21,450 in call options on behalf of himself, his family, and Tamayo.  In addition, Tamayo's friends bought approximately $16,282 worth of Brink's shares.  During this time, Tamayo, Eydelman, Eydelman's customers family and friends, Tamayo's friends, and Metro purchased approximately 50,916 shares of Brink's, and used the purchase of approximately 460 call options and the sale of 160 put options to further leverage their investment.

83.     On January 18, 2010, which was a holiday, Tyco publicly announced its intention to acquire Brink's for $42.50 per share.  Tyco's announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to Tyco on the deal.

84.     The following trading day, Brink's stock closed at $41.54 per share, an increase of $10.12, or 32 percent, over the prior trading day's closing price with an increased trading volume of more than 44 times the prior trading day.

85.     Eydelman and Tamayo began selling shares of Brink's on the morning of January 19, 2010, the first trading day after the announcement.

20

86.     Metro, Tamayo, and Eydelman learned of Tyco's acquisition of Brink's at least three weeks before it was announced, and traded on the basis of that information.

87.     Tamayo's personal trading generated approximately $142,615 in profits.  In total, the illegal trading generated approximately $773,154 in illicit profits.

88.     On January 29, 2010, Oppenheimer's compliance department forwarded to Eydelman an inquiry received from the Chicago Board Options Exchange ("CBOE") regarding trading in Brink's options by certain of Eydelman's customers in advance of the Tyco acquisition announcement.  Eydelman responded by attaching several research reports, claiming that he had decided to trade based on his research.  In reality, Eydelman had decided to trade based on the material, nonpublic information about Brink's passed to him by Tamayo from Metro.

89.     Eydelman told Tamayo about the CBOE inquiry and how Eydelman intentionally sent Tamayo the contrived emails with research reports in case an inquiry such as this occurred.

90.     Tamayo then told Metro about the CBOE inquiry and Eydelman's false response.

### 2.   *Smithtown Bancorp., Inc.*

91.     On or about May 7, 2010, Simpson Thacher first billed work to its client, People's United Financial, Inc. ("People's"), in connection with People's possible acquisition of Smithtown Bancorp., Inc. ("Smithtown").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

92.     The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to People's possible acquisition

of Smithtown.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

93.     The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

94.     By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding People's potential acquisition.

95.     Metro misappropriated from his employer and its client material, nonpublic information concerning People's possible acquisition of Smithtown, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of Smithtown by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

96.     Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty.  Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

97.     On July 7, 2010, Metro and Tamayo exchanged four text messages beginning at 9:47 p.m.

98.     Tamayo called Eydelman the next morning at 8:33 a.m.  Approximately two hours later, Eydelman began purchasing Smithtown shares for several of his customers' accounts, as well as for his own account.

99.     On July 9, 2010, at 10:49 a.m., Eydelman emailed Tamayo a research report on Smithtown, dated June 9, 2010.  Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of Smithtown based on the material, nonpublic information provided by Metro.

100.    Over the next week, Tamayo began to purchase shares, and Eydelman continued to add to his position, acquiring shares for his own account and for the accounts of his family members and customers.

101.    From July 8, 2010 through July 15, 2010, accounts owned or controlled by Tamayo and Eydelman or their friends purchased approximately 220,240 shares of Smithtown for $807,916.

102.    During this time, Smithtown's stock price increased from a closing price of $3.05 on July 7, 2010, to a closing price of $4.01 on July 12, 2010.  Trading by Eydelman, Tamayo, and Eydelman's friends made up approximately 13.6 percent of the total trading volume during this period.

103.    On July 15, 2010, at 4:11 p.m., People's announced a definitive agreement under which it would acquire Smithtown in a cash and stock transaction valued at $4.00 per share. People's announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to People's on the deal.

104.    The stock price did not increase on the day of the announcement.  Smithtown's stock price already had increased from July 7 to July 12 to the approximate deal price, which was due, at least in part, to trading initiated by Eydelman, Tamayo, and Eydelman's friends.  Nevertheless, on the first trading day after the announcement, the stock's trading volume increased by 211 percent.

105.     Eydelman, Tamayo, and Eydelman's friends began selling shares of Smithtown on the morning of July 16, 2010, the first trading day after the announcement.

106.    Eydelman and Tamayo learned of People's acquisition of Smithtown at least one week before the announcement, and traded on the basis of that information.  Tamayo's personal trading generated approximately $5,524 in profits.  In total, the illegal trading eventually generated illicit profits of approximately $29,010.

### 3.   CNA Surety Corp.

107.    On or about September 27, 2010, Simpson Thacher first billed work to its client, CNA Financial Corp. ("CNA Financial"), in connection with a possible tender offer for CNA Surety Corp. ("CNA Surety").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

108.    The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to CNA Financial's possible tender offer for CNA Surety.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

24

109.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

110.    By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding CNA Financial's potential tender offer.

111.    Metro misappropriated from his employer and its client material, nonpublic information concerning CNA Financial's possible tender offer for CNA Surety, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of CNA Surety by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

112.    Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty.  Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.  For the same reasons, Tamayo knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf.

113.    On September 29, 2010, CNA Financial met with Simpson Thacher concerning a possible transaction with CNA Surety.  As of October 19, 2010, substantial steps had been taken toward commencing a tender offer by CNA Financial.

114.    At 5:31 p.m. on October 19, 2010, Metro and Tamayo began an exchange of five text messages.  Thirty minutes later, Tamayo and Eydelman exchanged seven phone calls that lasted, collectively, over 13 minutes.  Before they began communicating, Tamayo and Metro had last communicated by telephone or text on September 15, 2010.

115.    The next day, Tamayo purchased 2,000 shares of CNA Surety.  Approximately 15 minutes later, Eydelman began buying CNA Surety shares for his customers and himself.

116.    On October 21, 2010, the day after their purchases began, Eydelman emailed Tamayo research reports on CNA Surety, dated June 9, 2010.  Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of CNA Surety based on the material, nonpublic information provided by Metro.

117.    From October 20 through October 29, 2010, Tamayo, Eydelman, Eydelman's customers, and Eydelman's friends invested approximately $1,227,108 to build positions in CNA Surety.  Tamayo himself purchased 12,000 shares.

118.    On November 1, 2010 at 6:00 a.m., CNA Financial announced that it signed a definitive merger agreement pursuant to which CNA Financial would commence a tender offer to acquire all outstanding shares of common stock of CNA Surety not currently owned by subsidiaries of CNA Financial for $26.55 per share. The $26.55 per share price represented a 38 percent premium to the closing price of CNA Surety's common stock on October 29, 2010.  CNA Financial's announcement and the news coverage of the tender offer that followed stated that Simpson Thacher acted as legal counsel to CNA Financial on the deal.

119.     Two hours after CNA Financial's announcement, at 8:09 a.m., Eydelman telephoned Tamayo.  Within half an hour of that call, Eydelman, Tamayo, and the accounts of Eydelman's family members, customers and friends began selling their shares of CNA Surety.

120.     CNA Surety's trading volume on November 1 surged more than 70 times the prior trading day's volume.

121.     Eydelman and Tamayo learned of CNA Financial's tender offer for CNA Surety approximately 12 days before the announcement, and traded on the basis of that information. Tamayo's personal trading generated approximately $45,667 in profits.  In total, the illegal trading eventually generated illicit profits of approximately $241,141.

### 4.   Graham Packaging Co.

122.     On or about February 6, 2011, Simpson Thacher first billed work to its client, Graham Packaging Co., Inc. ("Graham"), in connection with Graham's possible acquisition by Silgan Holdings Inc. ("Silgan").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

123.     The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Silgan's possible acquisition of Graham.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

124.     The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

27

125.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Graham's possible acquisition.

126.    Metro misappropriated from his employer and its client material, nonpublic information concerning Silgan's possible acquisition of Graham, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of Graham by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

127.    Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty.  Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

128.    On April 11, 2011, Metro and Tamayo exchanged six text messages during a five-minute period.  Tamayo called Eydelman approximately 17 minutes later.  They spoke for over three minutes, and then followed the call with another call that lasted nearly four minutes.

129.    An hour after these calls, as set forth below in paragraphs 262, 265-266, Eydelman sent Tamayo an email providing a purportedly legitimate basis for their future purchase of shares of Graham.  Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to

Eydelman, and after they decided to purchase shares of Graham based on the material, nonpublic information provided by Metro.

130.    Following these communications, from April 11, 2011 through April 12, 2011, Tamayo bought 9,000 shares of Graham, Eydelman purchased 15,000 shares for his customers, and a friend of Tamayo bought 1,750 shares for a combined investment of over $430,820.

131.    The next day, on April 13, 2011 at 6:30 a.m., Graham announced the signing of a definitive merger agreement under which Silgan would acquire Graham in a cash-and-stock transaction valued at $19.56 per share.  Graham's announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to Graham on the deal.  Within two and a half hours of Graham's announcement, Tamayo, Eydelman and Tamayo's friend begin selling shares of Graham.

132.    Graham's stock price closed at $22.22 on April 13, an increase of nearly 33 percent over the prior day's closing price on an increase of nearly 50 times the trading volume.

133.    Metro, Tamayo, and Eydelman learned of Silgan's acquisition of Graham just two days before the announcement, and traded on the basis of that information.  Tamayo's personal trading generated approximately $36,569 in profits.  In total, the illegal trading eventually generated approximately $105,964 in illicit profits.

### 5.  SMART Modular

134.    On or about September 16, 2010, Simpson Thacher first billed work to its client, Silver Lake Partners ("Silver Lake"), in connection with Silver Lake's possible acquisition of SMART Modular Technologies, Inc. (WWH) ("SMART Modular").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

29

135.    The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Silver Lake's possible acquisition of SMART Modular.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

136.    The information that Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

137.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Silver Lake's possible acquisition.

138.    Based upon the facts and reasonable inferences, Metro misappropriated from his employer and its client material, nonpublic information concerning Silver Lake's possible acquisition of SMART Modular, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in the shares of SMART Modular by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

139.    Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had

access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

140.    On January 27, 2011, Metro and Tamayo exchanged five text messages and one phone call prior to 3:08 p.m.  About an hour later, Eydelman called Tamayo and the two exchanged four phone calls, the last of which occurred at 4:28 p.m.  Tamayo texted Metro two minutes later.

141.    The next morning, Tamayo and Eydelman exchanged four phone calls.  At 3:22 p.m., one of Eydelman's customers and the employer of one of Eydelman's friends purchased 5,000 shares of SMART Modular.

142.    Early on Monday, January 31, 2011, Tamayo and Eydelman exchanged two phone calls; later that morning, Eydelman began buying shares of SMART Modular for other customers' accounts.

143.    On February 2, 2011, a few minutes after Tamayo and Eydelman spoke, Tamayo entered into a bullish option position by selling 100 April 2011 in-the-money puts with a strike price of $7.50.  A put option is referred to as "in-the-money" when the strike or exercise price of the put option contract is above the current price of the underlying stock.  Later that day, Tamayo and Metro exchanged five text messages.

144.    Eydelman and Tamayo engaged in contrived emails regarding SMART Modular beginning on March 20, 2011.  Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of SMART Modular based on the material, nonpublic information provided by Metro.

145.    From February 3, 2011 through April 25, 2011, SMART Modular's share price fluctuated from the low-$6 range to the mid-$8 range.  SMART Modular's low closing price for the period was $6.22 per share on March 16, 2011, and its high closing price during the period was $8.47 on April 8, 2011.

146.    Also from February 3, 2011 through April 25, 2011, Eydelman sold some of his customers' shares of SMART Modular and covered previously established option positions. Eydelman sold these shares to capture profits due to SMART Modular's short-term price changes during this time or to liquidate assets to fund other timely purchases (*e.g.*, Graham Packaging, discussed above).  Throughout this period, Tamayo maintained his bullish option position in SMART Modular.

147.    One of Tamayo's friends purchased 4,000 shares of SMART Modular on March 14, following a more than ten minute telephone call with Tamayo.  This friend doubled his position on April 13.

148.    Between January 31, 2011, and April 19, 2011, Eydelman, Tamayo, and accounts belonging to Eydelman's customers and to friends of Eydelman and Tamayo invested approximately $6,272,785 to acquire approximately 947,150 shares of SMART Modular.  They invested another $68,750 to acquire approximately 450 call options and 1,150 put options.  They also sold approximately 3,150 put options during this time period.

149.    On April 26, 2011 at 8:30 a.m., SMART Modular announced that it had agreed to be acquired by Silver Lake and its affiliate, Silver Lake Sumeru, for $645 million.  Silver Lake offered $9.25 a share in cash, which was approximately 13 percent above SMART Modular's closing price on April 25.  SMART Modular's shares also saw an increase in trading volume of more than 24 times the prior trading day's volume.  The announcement and the news coverage of

the acquisition that followed stated that Simpson Thacher acted as legal counsel to Silver Lake on the deal.

150.    Tamayo, Eydelman, Eydelman's family members and customers, and Tamayo's and Eydelman's friends began selling shares of SMART Modular within 40 minutes of the announcement.

151.    Metro, Tamayo, and Eydelman learned of Silver Lake's possible acquisition of SMART Modular prior to the transaction's announcement, and traded on the basis of that information.  Tamayo's personal trading generated approximately $163,907 in profits.  In total, the illegal trading eventually generated approximately $1,575,382 in illicit profits.

### *6. Vital Images*

152.    On September 15, 2010, Toshiba formally engaged Simpson Thacher to serve as its legal adviser with respect to a possible tender offer for Vital.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

153.    The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, and how Tamayo passed information to Eydelman, worked in the same manner with respect to Toshiba's possible tender offer for Vital.  The additional evidence set forth below outlines other relevant communications and trading by Eydelman in his customer accounts.

154.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

155.    By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Toshiba's potential tender offer.

156.    Metro misappropriated from his employer and its client material, nonpublic information concerning Toshiba's possible tender offer for Vital, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of Vital by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

157.    Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty.  Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.  For the same reasons, Tamayo knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf.

158.    On January 28, 2011, Toshiba and Vital executed a confidentiality and standstill agreement and Vital began providing Toshiba with nonpublic documents.  On February 16, Toshiba submitted its non-binding indication of interest to acquire all of the outstanding shares of common stock of Vital at a price of $17.00-18.00 per share.  On April 6, 2011, Simpson Thacher provided the first draft of the merger agreement to counsel for Vital.  As of April 4,

2011, the date of the first purchase by Eydelman's customers, substantial steps had been taken toward commencing a tender offer by Toshiba.

159. On April 1, 2011, Metro and Tamayo exchanged five text messages beginning at 4:33 p.m. Then on April 4, 2011, Metro and Tamayo exchanged two more text messages beginning at 9:39 a.m.

160. On April 4, 2011, at 4:04 p.m., Eydelman began purchasing Vital shares in his customer accounts. Eydelman purchased 19,000 shares for approximately $153,151 between April 4 and April 21, 2011 in his customer accounts. Tamayo passed to Eydelman the material, nonpublic information he had received from Metro concerning Vital prior to Eydelman purchasing shares on behalf of his customers.

161. Prior to the merger announcement, between April 25 and April 27, 2011, Eydelman sold 16,300 of the Vital shares he had purchased in his customer accounts. Vital's stock price had increased from April 4 through April 25, which resulted in profits of $14,317.

162. Following the close of the stock market on April 27, 2011, Toshiba and Vital issued a joint press release announcing the transaction pursuant to which a subsidiary of Toshiba would acquire all outstanding Vital shares for $18.75 per share through a cash tender offer. Vital's stock price closed at $18.66 the next trading day, which represented a 31.45 percent increase over the prior day's closing price. Toshiba's announcement and the news coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to Toshiba on the deal.

163. Following the announcement, Eydelman sold the remaining 2,700 shares for profits of approximately $24,916. Tamayo did not purchase shares of Vital in advance of the announcement.

### 7.   *International Coal*

164.    On or about March 11, 2011, Simpson Thacher first billed work to its client, Arch Coal Inc. ("Arch Coal"), in connection with a possible tender offer for International Coal, Inc. ("International Coal").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

165.    The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Arch Coal's possible tender offer for International Coal.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

166.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced. By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Arch Coal's potential tender offer.

167.    Metro misappropriated from his employer and its client material, nonpublic information concerning Arch Coal's possible tender offer for International Coal, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of International Coal by Tamayo and others. Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

36

168.    Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.  For the same reasons, Tamayo knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf.

169.    On April 20, 2011, International Coal provided a draft merger agreement to Arch Coal and Simpson Thacher.  As of April 28, 2011, substantial steps had been taken toward commencing a tender offer by Arch Coal.

170.    On the night of April 28, 2011, Metro and Tamayo exchanged seven text messages.

171.    The next morning, Tamayo and Metro exchanged three more text messages and, approximately one hour later, Tamayo and Eydelman began exchanging phone calls.  They exchanged eight phone calls from 11:33 a.m. through 2:20 p.m.

172.    Three minutes after their last call, Eydelman sent Tamayo an email recommending the purchase of International Coal.  Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of International Coal based on the material, nonpublic information provided by Metro.

173.    Later that day, at 3:32 p.m., Tamayo bought 40,000 shares, and Eydelman then purchased for his other customers another 28,500 shares of International Coal.  They invested approximately $755,808 to quickly acquire these positions.

37

174.    On May 2, 2011 at 7:30 a.m., Arch Coal announced that it would buy International Coal for $3.4 billion in cash.  Arch Coal offered $14.60 for every International Coal share, a premium of 32 percent over International Coal's closing price on April 29, 2011.  Arch Coal's announcement and the news coverage that followed stated that Simpson Thacher acted as legal counsel to Arch Coal on the deal.

175.    Within two hours of the announcement, Eydelman and Tamayo began selling shares of International Coal.

176.    Shares of International Coal closed at $14.42, a 30.7 percent increase over the prior day's closing price with an increase in trading volume of more than 18 times the prior day's trading volume.

177.    Metro, Tamayo, and Eydelman learned of Arch Coal's tender offer for International Coal approximately four days before it was announced, and traded on the basis of that information.  Tamayo's personal trading generated approximately $135,052 in profits.  In total, the illegal trading eventually generated approximately $231,276 in illicit profits.

### 8.  *PharMerica Corp.*

178.    Simpson Thacher served as legal counsel to PharMerica Corporation ("PharMerica"), Omnicare Corporation ("Omnicare"), or a third party involved in connection with Omnicare's tender offer for PharMerica.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

179.    The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Omnicare's possible tender

offer for PharMerica.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

180.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

181.    By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding Omnicare's potential tender offer.

182.    Metro misappropriated from his employer and its client material, nonpublic information concerning Omnicare's possible tender offer for PharMerica, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of PharMerica by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

183.    Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.  For the same reasons, Tamayo knew or had reason to know at the time of his purchases that the information had been acquired from the offeror, the issuer, or someone working on their behalf.

184.    On June 17, 2011, the Chief Executive Officer of Omnicare contacted the Chief Executive Officer of PharMerica to inform him that he was sending him a letter expressing

Omnicare's interest in exploring a potential business combination with PharMerica where Omnicare would purchase all of the outstanding shares of PharMerica. As of June 17, 2011, substantial steps had been taken toward commencing a tender offer by Omnicare.

185.    On June 20, 2011, Metro and Tamayo exchanged three texts between 9:02 a.m. and 2:40 p.m.  On June 21, 2011, Metro and Tamayo exchanged 11 texts between 9:01 a.m. and 11:30 a.m.

186.    Eydelman began purchasing shares for himself at 12:07 p.m. on June 21, followed shortly thereafter by purchases on behalf of his customers, including Tamayo.  Tamayo passed to Eydelman the material, nonpublic information he had received from Metro concerning PharMerica prior to Eydelman purchasing shares for himself or his customers.

187.    At 12:11 p.m., Eydelman sent Tamayo an email with a news report that PharMerica had hired a financial adviser and had begun accepting bids for the company. Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of PharMerica based on the material, nonpublic information provided by Metro. Tamayo and Eydelman communicated by telephone at 12:12 p.m.  Seven minutes later, Tamayo responded to Eydelman's email.

188.    Two hours later, Eydelman entered into a bullish option position by selling put option contracts expiring in December with a strike price of $15.  The next day, Eydelman sold additional put options for himself and Tamayo.  On June 21, PharMerica's closing price was $13.36, and it was $12.65 on June 22.  The strike price of $15 matched the price per share that Omnicare would publicly announce it was offering for PharMerica two months later.

189.     From June 21, 2011, through August 22, 2011, PharMerica's share price fluctuated from the mid-$10 range to the high-$13 range. PharMerica's low closing price for the period was $10.69 per share on August 8, 2011, and its high closing price during the period was $13.89 per share on July 8, 2011. Throughout the period, Tamayo maintained a bullish position in PharMerica.

190.     Between June 21, 2011, and August 22, 2011, Eydelman, his family members and customers, Tamayo, and Eydelman's friends invested approximately $7,543,880 to purchase approximately 695,650 shares of PharMerica. They also bought approximately 1,511 call options for approximately $143,270.

191.     On August 23, 2011, at 7:01 a.m., Omnicare announced that it had provided PharMerica's board of directors with a proposal to acquire all of PharMerica's outstanding commons shares for $15.00 per share in a transaction estimated to be worth $716 million. The proposed share price was approximately 25.9 percent above the average closing price over the prior 30 days and approximately 37.2 percent above PharMerica's closing price on August 22.

192.     Tamayo, Eydelman, and Eydelman's family members, customers, and friends began selling shares of PharMerica within seven minutes of the market opening on August 23.

193.     On August 23, PharMerica's closing price was $13.89, as compared to $10.93 on August 22. Moreover, PharMerica's shares saw an increase in trading volume of more than 2,300 percent over the prior day's trading volume.

194.     Metro, Tamayo, and Eydelman learned of Omnicare's possible tender offer for PharMerica prior to the transaction's announcement and traded on the basis of that information. Tamayo's personal trading generated approximately $157,902 in profits. In total, the illegal trading eventually generated approximately $1,517,092 in illicit profits.

41

### *9.   Collective Brands*

195.     Simpson Thacher served as legal counsel to J.P. Morgan Securities LLC, J.P. Morgan Chase Bank, and Wells Fargo Securities, LLC with respect to Wolverine World Wide, Inc.'s efforts to obtain financing to fund the acquisition of the Performance + Lifestyle group business of Collective Brands, Inc. ("Collective Brands").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

196.     The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Wolverine World Wide, Inc.'s efforts to obtain financing to fund the acquisition of Collective Brands.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

197.     The information that Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

198.     By virtue of his employment at Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the acquisition.

199.     Metro misappropriated from his employer and its client material, nonpublic information concerning Wolverine World Wide's possible acquisition of Collective Brands, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his

communications with Tamayo would lead to trading in shares of Collective Brands by Tamayo and others. Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

200. Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

201. On April 2, 2012, starting with an 8:01 a.m. text from Metro, Metro and Tamayo exchanged three text messages.

202. On April 16, 2012, Eydelman and Tamayo spoke for eight minutes beginning at 2:26 p.m. and then again for over four minutes at 3:05 p.m.

203. In between these two calls, Eydelman sent Tamayo an email with a news report that Collective Brands was accepting bids for the company. Tamayo responded to the email one minute after their second telephone call. Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of Collective Brands based on the material, nonpublic information provided by Metro.

204. Approximately 10 minutes later, Eydelman bought 300 call options expiring in May with a strike price of $20. Six minutes later, he bought 200 more call options with the same expiration and strike price.

205. At 3:53 p.m., Eydelman purchased for a customer 60 call options expiring in May with a strike price of $20, followed closely by Tamayo's purchase of 700 May call options with

the same strike price at 3:58 p.m.  Collective Brands closed the day's trading with a per-share price of $19.32.

206.    From April 16 through April 20, 2012, Eydelman continued to buy tens of thousands of call options and shares of Collective Brands for several of his customers' accounts, as well as himself and a family member.

207.    On April 23, 2012, news leaked that Wolverine World Wide and others had submitted bids to acquire Collective Brands, and on April 24, 2012, Collective Brands announced that its Board of Directors, together with management, would conduct a review of strategic and financial alternatives.

208.    On May 1, 2012, Collective Brands announced that it entered into a definitive agreement under which Wolverine World Wide and others would acquire Collective Brands for $21.75 per share in cash.  News coverage of the acquisition that followed stated that Simpson Thacher acted as legal counsel to initial purchasers and lenders on the deal.

209.    On May 1, Collective Brands' closing price was $21.16 per share, a $0.39 increase over the closing day's price of $20.77 per share.  Trading volume in Collective Brands on May 1 also jumped by more than 822 percent over the prior day's trading.

210.    Metro, Tamayo, and Eydelman learned of the possible acquisition of Collective Brands approximately one month prior to its announcement, and traded on the basis of that information.  Tamayo's personal trading generated approximately $73,635 in profits.  In total, the illegal trading eventually generated approximately $360,775 in illicit profits.

*10. Company A*

211.    In 2012 Simpson Thacher served as legal counsel to a party in connection with a corporate transaction concerning Company A.  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

212.    The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to the possible corporate transaction concerning Company A.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

213.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

214.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the potential merger.

215.    Metro misappropriated from his employer and its client material, nonpublic information concerning a corporate transaction involving Company A.  Metro then knowingly traded based on the information and also knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of Company A by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

216.     Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty. Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

217.     Metro texted Tamayo on May 10, 2012 at 12:15 p.m.  At 3:22 p.m., Metro purchased 2,400 shares of Company A.  Metro added another 320 shares the following day. Metro invested approximately $33,699 to make these purchases.

218.     On May 14, 2012, Tamayo and Eydelman exchanged two calls beginning at 9:39 a.m.

219.     Eydelman began purchasing options on Company A on May 14, 2012, at 3:39 p.m.  He then followed this purchase with stock and option purchases for Tamayo and other of his customers' accounts.

220.     At 6:16 p.m., Eydelman sent Tamayo research on Company A.  Eydelman sent this email to Tamayo after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of Company A based on the material, nonpublic information provided by Metro.

221.     Eydelman continued buying shares and pursuing his typical bullish option strategy for the next four months.  Throughout this entire period, Tamayo and Eydelman invested approximately $7,858,048 on behalf of themselves and Eydelman's family and customers to purchase approximately 627,815 shares of Company A and another $1,701,848 to purchase approximately 10,825 options.

222.     The possible corporate transaction concerning Company A has not materialized, nor has it been made public.

223.     Company A's stock price began to steadily decrease in the second half of 2012. As a result, Metro, Tamayo, Eydelman, and Eydelman's customers lost money on their purchases of Company A's securities.

224.     One of Eydelman's customers complained to Eydelman's then employer, Oppenheimer, about losses from Company A in accounts belonging to the customer and the customer's family members.  Oppenheimer provided the customer with a copy of a customer agreement, purportedly signed by the customer, which had provided Eydelman with discretionary authority over the customer's account.  Later, however, Eydelman admitted to Tamayo that he had forged the customer's signature on the customer agreement document around the time when the customer opened the account.  Eydelman left Oppenheimer shortly after the customers filed the complaints, and Tamayo followed.

### 11. Sealy Corp.

225.     Simpson Thacher served as legal counsel to Sealy Corp. ("Sealy") with respect to a possible merger between Sealy and Tempur-Pedic International Inc. ("Tempur-Pedic").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

226.     The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Sealy's possible merger with

Tempur-Pedic.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

227.    The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the transaction was publicly announced.

228.    By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the potential merger.

229.    Metro misappropriated from his employer and its client material, nonpublic information concerning Tempur-Pedic's possible acquisition of Sealy, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of Sealy by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

230.    Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty.  Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

231.    On September 19, 2012, only eight days before the transaction was announced, Metro texted Tamayo.  Tamayo called Eydelman 40 minutes later.  Tamayo and Eydelman spoke again later that afternoon.

232.    The following day, Tamayo called Eydelman at 11:50 a.m.

48

233.    At 12:54 p.m., Eydelman emailed Tamayo and suggested that he buy shares of a

mattress company "following the recent rebound of the housing market and all of the builders'

stocks."  Eydelman pointed to two research reports on Sealy, one of which was negative; the

other was neutral.  Eydelman sent this email after Metro had passed material, nonpublic

information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman,

and after they decided to purchase shares of Sealy based on the material, nonpublic information

provided by Metro.

234.    Starting at 1:45 p.m., Eydelman began purchasing 16,000 shares of Sealy for one

of his customers, and another 5,300 shares for his children's accounts.

235.    The next morning, September 21, 2012, Tamayo called Eydelman, and Eydelman

soon after purchased an additional 7,000 shares on behalf of a different customer.

236.    Also following this call between Tamayo and Eydelman, Tamayo directed the

purchase of 80,000 Sealy shares for a family member's account.

237.    In addition, also on the morning of September 21, Tamayo began purchasing

61,000 shares of Sealy in an account belonging to his girlfriend.

238.    The buying continued on Monday, September 24, when Tamayo purchased

20,000 shares in his own account.

239.    From September 20 through September 25, Tamayo and Eydelman invested

approximately $463,876 to acquire 214,000 shares of Sealy in accounts in the names of

themselves, their family members, Tamayo's girlfriend, and one of Eydelman's customers.

240.    On September 27, 2012 at 7:00 a.m., Tempur-Pedic and Sealy announced that

they had signed a definitive agreement to create a $2.7 billion global bedding provider.

Specifically, Tempur-Pedic agreed to acquire all of the outstanding common stock of Sealy for

$2.20 per share, representing a premium of approximately 23 percent to Sealy's 30-day average closing price.  Tempur-Pedic and Sealy's announcement and the news coverage that followed stated that Simpson Thacher acted as legal counsel to Sealy.

241.     Within two and a half hours of the announcement, Tamayo, Eydelman's family members and customer, and Tamayo's family members and girlfriend begin to sell shares of Sealy.

242.     Sealy's trading volume on September 27 increased more than 38 times its trading volume on the day before the announcement.

243.     Metro, Tamayo, and Eydelman learned of Tempur-Pedic's possible acquisition of Sealy approximately eight days before it was announced, and traded on the basis of that information.  Tamayo's personal trading, including trading in his sister's and girlfriend's accounts, generated approximately $7,306 in profits.  In total, the illegal trading eventually generated approximately $14,509 in illicit profits.

### 12. OfficeMax

244.     Simpson Thacher served as legal counsel to Office Depot, Inc. ("Office Depot") with respect to a possible acquisition of OfficeMax, Inc. ("OfficeMax").  In connection with its representation, Simpson Thacher obtained material, nonpublic information regarding the proposed transaction.

245.     The scheme described above generally in paragraphs 55 through 59, including the method by which Metro accessed confidential client information, how Metro passed information to Tamayo, how Tamayo passed information to Eydelman, and the contrived emails between Tamayo and Eydelman, worked in the same manner with respect to Office Depot's possible

acquisition of OfficeMax.  The additional evidence set forth below outlines other relevant communications and trading by Metro, Tamayo, and Eydelman.

246.  The information Simpson Thacher possessed regarding the transaction was highly confidential and was not intended to be disclosed before the possible acquisition was publicly announced.

247.  By virtue of his employment by Simpson Thacher, Metro had the opportunity to and, based upon the facts and reasonable inferences, did obtain material, nonpublic information regarding the transaction.

248.  Metro misappropriated from his employer and its client material, nonpublic information concerning Office Depot's possible acquisition of OfficeMax, and knowingly or recklessly tipped Tamayo, who in turn passed this information to Eydelman.  Given Metro's relationship with Tamayo, Metro knew or was reckless in not knowing that his communications with Tamayo would lead to trading in shares of OfficeMax by Tamayo and others.  Indeed, on information and belief, that was the intended purpose of Metro's communication of material, nonpublic information to Tamayo.

249.  Tamayo knew or should have known that the prescient, material, nonpublic information he received regarding the possible acquisition was conveyed in violation of a duty.  Tamayo knew that Metro was employed by Simpson Thacher, and he also knew that Metro had access to material, nonpublic information in light of the timeliness, accuracy, and repeated nature of the information that he received.

250.  On January 30, 2013, at 1:30 p.m., Metro sent a text message to Tamayo.  Metro and Tamayo then exchanged an additional 11 text messages over the next half-hour.

251.   Tamayo called Eydelman the next morning and then exchanged 10 telephone calls with Eydelman.  Ten minutes after their last call, Tamayo purchased 12,000 shares of OfficeMax, followed by purchases by Eydelman for himself and several of his customers.

252.   That same day, Tamayo also took a bullish option position in OfficeMax, buying 400 call options expiring in February 2013 with a strike price of $11.  The stock price closed at $10.78 that day.

253.   From January 31, 2013 through February 15, 2013, Tamayo and Eydelman, on behalf of himself, his family, and his customer, bought approximately 151,100 shares of OfficeMax for approximately $1,635,614 and bought approximately 2,010 call options for approximately $96,138.

254.   Eydelman sent Tamayo an email on February 12, 2013, at 4:03 p.m., with a news report about OfficeMax.  Eydelman sent this email after Metro had passed material, nonpublic information to Tamayo, after Tamayo had passed material, nonpublic information to Eydelman, and after they decided to purchase shares of OfficeMax based on the material, nonpublic information provided by Metro.

255.   On February 18, 2013, which was a holiday, the *Wall Street Journal* reported that OfficeMax and Office Depot were in advanced merger talks.  OfficeMax's stock price surged the next day, opening at $13.57 per share, or approximately a 24 percent increase over the prior trading day's close.  The trading volume in the stock increased by more than 536 percent.  The news coverage that followed the initial *Wall Street Journal* report indicated that Simpson Thacher acted as legal counsel to Office Depot on the deal.

256.   Metro, Tamayo, and Eydelman learned of Office Depot's possible acquisition of OfficeMax approximately three weeks before news of the transaction leaked, and traded based

on that information.  Tamayo's personal trading generated approximately $130,897 in profits.  In total, the illegal trading eventually generated approximately $573,332 in illicit profits.

**Tamayo's Conduct was Intentional and Deceptive**

257.    Tamayo's conduct was calculated, repeated and egregious.  Tamayo knew that Metro worked for Simpson Thacher and had access to material, nonpublic information.  He also knew that Metro accessed and obtained information on his employer's computer system concerning pending deals, and that this information was confidential client information that Metro had a duty to not pass on to others, including Tamayo.  Despite knowing this, Tamayo traded based on the material, nonpublic information given to him by Metro in advance of 12 of the 13 announcements.

258.    Tamayo's conduct was deceptive.  As described above, Tamayo and Metro took steps to minimize the possibility of detection, including intentionally limiting telephone and text communications to seemingly innocuous statements, such as "let's meet for coffee."  Following these communications, they would meet and Metro would convey the material, nonpublic information to Tamayo by pointing to stock ticker symbols on his smartphone so as to not document any evidence of a communication.  The clandestine nature of these meetings should have alerted and did, in fact, alert Tamayo to the fact that Metro's and his conduct was illegal.

259.    Tamayo also took steps to secretly reward and compensate Metro for his tips by, *inter alia*, entering into an agreement with Metro whereby Tamayo would allocate to Metro a portion of the proceeds of the illegal trading.  Tamayo also agreed to keep the proceeds due to Metro pursuant to this agreement in Tamayo's brokerage account for later distribution.

260.    Tamayo and Eydelman also took numerous steps to avoid detection, including the following: (a) meeting in a well-traveled, highly trafficked, and noisy location – Grand Central

53

Station; (b) destroying evidence (Tamayo, while Eydelman watched, chewed up, and sometimes ate, the post-it note or napkin identifying the name and/or ticker symbol of the firm whose stock price would increase as a result of the transaction); and (c) creating a legitimate-looking-but-contrived paper trail for outside observers by exchanging emails concerning stock research that Eydelman gathered on the subject companies and/or Eydelman's purported thoughts on the companies.  In every instance, such correspondence occurred after Tamayo passed Eydelman the material, nonpublic information, and after Tamayo and Eydelman had already decided to trade on the basis of that information.

261.    Tamayo received a personal benefit from his gift of material, nonpublic information to his friend and broker, Eydelman, in the form of giving valuable, confidential information to a long-term friend.  In addition, as Tamayo's broker, Eydelman was in a position to and did place trades on Tamayo's behalf and to assist Tamayo by creating emails providing a purportedly legitimate basis for their illegal trades.

## Contrived Emails

262.    Eydelman's email correspondence with Tamayo evidences Tamayo's intent to deceive and an understanding that his conduct was improper.  Eydelman, with Tamayo's knowledge, frequently crafted contrived emails around the time of his and Tamayo's initial trading in many of the securities to cover-up their illicit conduct with a false paper trail, using Eydelman's work email address, reciting purportedly non-fraudulent (but false) bases for the trades.  In every instance, however, at the time they concocted these emails, Tamayo had already received from Metro material, nonpublic information, and Tamayo already had passed the information to Eydelman.  Moreover, these communications contain no reference to the fact that Eydelman and Tamayo already had met in person and were furiously exchanging text messages

and telephone calls.  And in many instances, these communications occurred *after* Eydelman and Tamayo had already begun to purchase the securities in question.

263.    For example, with respect to the trading in Brink's, on December 31, 2009, at 1:29 p.m., Eydelman sent Tamayo an email containing two Brink's research reports, to which Tamayo responded: "Outperform nice!!"  Eydelman then responded:

> I like this one. . . . considering that, short term, whether the mkt
> continues to rally or not is so uncertain – this one is good since
> their business should be recession proof. So being long it now
> gives us exposure to the mkt while having downside protection in a
> company with a growing business in any sort of an economy.

264.    However, as detailed above in paragraphs 75 through 103, Eydelman and Tamayo exchanged these emails *after* Metro tipped Tamayo and *after* Tamayo tipped Eydelman.  In addition, Eydelman sent the email less than an hour and a half *after* Tamayo and Metro exchanged seven text messages, *after* Tamayo and Eydelman exchanged two phone calls, and *after* Eydelman bought Brink's shares for his personal and customers' accounts.  And, despite Eydelman's supposed conclusion that the security was a good long-term, "recession proof" investment, Eydelman and Tamayo, the accounts they controlled, and their friends *all* held the securities for less than a month.

265.    Similarly, Tamayo and Eydelman exchanged contrived emails to conceal their true reason for investing over $430,000 in Graham Packaging, namely, the material, nonpublic information Tamayo had already received from Metro and that Tamayo had passed to Eydelman. On April 11, 2011, at 2:32 p.m., Eydelman sent to Tamayo an email saying:

> we just announced that we are participating in a secondary offering
> for gpk [Graphic Packaging Holding Company], a packaging
> company.  this sector looks solid.  we can't buy this one for you as
> it is restricted here but there is another one in the group (grm)
> [Graham] that is down from 18 to 16.45.  i think it is timely to get
> some of this.

Tamayo immediately responded: "OK I think I want to sell SMOD and back up the truck on this to see if it pops a bit because of the GPK offering."

266.    However, as described above in paragraphs 128 and 129, Eydelman and Tamayo exchanged these emails *after* Metro tipped Tamayo and *after* Tamayo tipped Eydelman. Additionally, Eydelman's first email was sent two hours *after* a string of text messages between Tamayo and Metro, *after* two calls between Tamayo and Eydelman, and immediately before Eydelman and Tamayo began buying shares of Graham Packaging.  Moreover, there is little positive correlation between the impact of a secondary offering in one packaging company on the stock price of another, *different* packaging company,  making Tamayo's purported belief that the stock price of Graham would "pop[]" make little sense.

267.    Similar, contrived emails between Eydelman and Tamayo accompanied Metro, Tamayo, and Eydelman's trading in all of the relevant issuers with the exception of Vital. Eydelman did not send Tamayo an email regarding Vital because, even though Tamayo received material, nonpublic information regarding Vital from Metro and passed that information to Eydelman, Tamayo decided not to trade in Vital personally.

**FIRST CLAIM FOR RELIEF**

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

268.    The Commission re-alleges and reincorporates paragraphs 1 through 267 as if fully set forth herein.

269.    With respect to his trading preceding each merger announcement described above, Defendant Tamayo, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:

(a)    employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material fact or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

270.    By reason of the actions alleged herein, Defendant Tamayo violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and unless restrained and enjoined will continue to do so.

**SECOND CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

271.    The Commission re-alleges and reincorporates paragraphs 1 through 267 as if fully set forth herein.

272.    With respect to his trading, specifically selling options, preceding announcements involving  issuers Brink's, SMART Modular, PharMerica, Collective Brands, and OfficeMax described above, Defendant Tamayo, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities:

(a)     employed devices, schemes, or artifices to defraud;

(b)     obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or;

(c)     engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

273.     By reason of his actions alleged herein, Defendant Tamayo violated Section

57

17(a) of the Securities Act [*15 U.S.C. § 77q(a)*] and unless restrained and enjoined will continue to do so.

### THIRD CLAIM FOR RELIEF

### Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder

274.    The Commission re-alleges and reincorporates paragraphs 1 through 267 as if fully set forth herein.

275.    Prior to the public announcement of the tender offers for International Coal, CNA Surety, Vital Images, and PharMerica, and after a substantial step or steps to commence each of the aforementioned tender offers had been taken, Tamayo, while in possession of material information relating to the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased and/or caused to be purchased securities in each of the companies identified in paragraphs 12, 20, 22, and 27, above.

276.  By reason of his actions alleged herein, Defendant Tamayo violated Section 14(e) of the Exchange Act [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder and unless restrained and enjoined will continue to do so.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(i)    finding that the Defendant Tamayo violated the antifraud provisions of the federal securities laws as alleged herein;

(ii)    permanently enjoining Defendant from violating Securities Act Section 17(a) [*15 U.S.C. § 77q(a)*], Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5

thereunder [*17 C.F.R. § 240.10b-5*] and Exchange Act Section 14(e) [*15 U.S.C. § 78n(e)*] and Rule 14e-3 [*17 C.F.R. § 240.14e-3*] thereunder;

(iii)    ordering the Defendant to jointly and severally disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received by any person or entity, including but not limited to all direct and indirect tippees, as a result of the actions alleged herein;

(iv)    ordering Defendant Tamayo to pay civil monetary penalties under Section 21A of the Exchange Act [*15 U.S.C. § 78u-1*] and Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(d)(3)*]; and

(v)    granting such other relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: September 19, 2014                    Respectfully submitted,


                                             */s/ Stephan J. Schlegelmilch*
                                             Stephan J. Schlegelmilch (D.C. Bar No. 983874)
                                             *Counsel for Plaintiff*
                                             U.S. SECURITIES AND EXCHANGE COMMISSION
                                             100 F Street, N.E.
                                             Washington, D.C.  20549
                                             Email: SchlegelmilchS@SEC.gov
                                             Phone: (202) 551-4935
                                             Facsimile: (202) 772-9292


Of Counsel:

    Bridget M. Fitzpatrick
    Daniel M. Hawke
    Antonia Chion
    Robert A. Cohen
    Jason J. Burt
    Carolyn M. Welshhans

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the

foregoing Complaint is not the subject of any other action pending in any court, or of any

pending arbitration or administrative proceeding.

By: _/s/ Stephan J. Schlegelmilch_____
Stephan J. Schlegelmilch (D.C. Bar No. 983874)
*Counsel for Plaintiff*
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Rule 101.10, because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above captioned action. Therefore, service upon the United States or its authorized designee, Paul Blaine, Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.

 */s/ Stephan J. Schlegelmilch*
Stephan J. Schlegelmilch (D.C. Bar No. 983874)
*Counsel for Plaintiff*
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549